UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

　　　　　　Plaintiff,

v.

LINDA BARBER, et al.,

　　　　　　Defendants.

CASE NO. C13-5539 BHS

ORDER DENYING PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff United States of America's ("Government") motion for summary judgment (Dkt. 79) and Defendants Bert Barber, Linda Barber, and Lori Thompson's (collectively "Defendants") motion for summary judgment (Dkt. 81). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby denies the motions for the reasons stated herein.

**I. PROCEDURAL HISTORY**

On July 1, 2013, the Government, on behalf of Diana Alton, filed a complaint against Defendants seeking enforcement of the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.* ("FHA"). Dkt. 1.

ORDER - 1

On August 20, 2014, both parties filed motions for summary judgment. Dkts. 79 & 81. On September 8, 2014, both parties responded. Dkt. 98 & 99. On September 12, 2014, both parties replied. Dkts. 100 & 101.

## II. FACTUAL BACKGROUND

In May 2008, Ms. Alton met with Ms. Barber to view an apartment owned by the Barbers. At that meeting, Ms. Alton filled out the application to rent the apartment. Dkt. 82-5; Dkt. 98, Ex. 1, Deposition of Diana Alton ("Alton Dep.") at 130:10–16, 133:4–17. In place of her employer, Ms. Alton wrote "Disabled" and indicated that her income, $1,055 per month, was from Social Security disability. Dkt. 82-5. Ms. Alton declared that when Ms. Barber saw the application at that meeting, Ms. Barber asked Ms. Alton about her disability. Alton Dep. at 133:21–134:2. In response, Ms. Alton told Ms. Barber that she had post-traumatic stress disorder and major clinical depression. *Id*. Ms. Alton also mentioned that she wanted to get a dog to assist her with her disabilities. *Id*. at 134:7–11. Ms. Barber informed Ms. Alton that she would have to pay the pet deposit because it was Washington State law. *Id*. at 145:11–146:4.2. Ms. Alton did not get a dog at that time. *Id*.

On February 4, 2009, Ms. Alton obtained a note from her healthcare provider stating that Ms. Alton was under the provider's care for depression and that it would be "very helpful for her to be allowed to have a dog as a service animal to help with her depression." Dkt. 82-16. Defendants concede that they received this note. Dkt. 81 at 6. On July 27, 2010, Ms. Alton obtained and then provided to Defendants a second note from her healthcare provider stating that she was under the provider's "care for treatment

On August 20, 2014, both parties filed motions for summary judgment. Dkts. 79 & 81. On September 8, 2014, both parties responded. Dkt. 98 & 99. On September 12, 2014, both parties replied. Dkts. 100 & 101.

## II. FACTUAL BACKGROUND

In May 2008, Ms. Alton met with Ms. Barber to view an apartment owned by the Barbers. At that meeting, Ms. Alton filled out the application to rent the apartment. Dkt. 82-5; Dkt. 98, Ex. 1, Deposition of Diana Alton ("Alton Dep.") at 130:10–16, 133:4–17. In place of her employer, Ms. Alton wrote "Disabled" and indicated that her income, $1,055 per month, was from Social Security disability. Dkt. 82-5. Ms. Alton declared that when Ms. Barber saw the application at that meeting, Ms. Barber asked Ms. Alton about her disability. Alton Dep. at 133:21–134:2. In response, Ms. Alton told Ms. Barber that she had post-traumatic stress disorder and major clinical depression. *Id*. Ms. Alton also mentioned that she wanted to get a dog to assist her with her disabilities. *Id*. at 134:7–11. Ms. Barber informed Ms. Alton that she would have to pay the pet deposit because it was Washington State law. *Id*. at 145:11–146:4.2. Ms. Alton did not get a dog at that time. *Id*.

On February 4, 2009, Ms. Alton obtained a note from her healthcare provider stating that Ms. Alton was under the provider's care for depression and that it would be "very helpful for her to be allowed to have a dog as a service animal to help with her depression." Dkt. 82-16. Defendants concede that they received this note. Dkt. 81 at 6. On July 27, 2010, Ms. Alton obtained and then provided to Defendants a second note from her healthcare provider stating that she was under the provider's "care for treatment

On August 20, 2014, both parties filed motions for summary judgment. Dkts. 79 & 81. On September 8, 2014, both parties responded. Dkt. 98 & 99. On September 12, 2014, both parties replied. Dkts. 100 & 101.

## II. FACTUAL BACKGROUND

In May 2008, Ms. Alton met with Ms. Barber to view an apartment owned by the Barbers. At that meeting, Ms. Alton filled out the application to rent the apartment. Dkt. 82-5; Dkt. 98, Ex. 1, Deposition of Diana Alton ("Alton Dep.") at 130:10–16, 133:4–17. In place of her employer, Ms. Alton wrote "Disabled" and indicated that her income, $1,055 per month, was from Social Security disability. Dkt. 82-5. Ms. Alton declared that when Ms. Barber saw the application at that meeting, Ms. Barber asked Ms. Alton about her disability. Alton Dep. at 133:21–134:2. In response, Ms. Alton told Ms. Barber that she had post-traumatic stress disorder and major clinical depression. *Id*. Ms. Alton also mentioned that she wanted to get a dog to assist her with her disabilities. *Id*. at 134:7–11. Ms. Barber informed Ms. Alton that she would have to pay the pet deposit because it was Washington State law. *Id*. at 145:11–146:4.2. Ms. Alton did not get a dog at that time. *Id*.

On February 4, 2009, Ms. Alton obtained a note from her healthcare provider stating that Ms. Alton was under the provider's care for depression and that it would be "very helpful for her to be allowed to have a dog as a service animal to help with her depression." Dkt. 82-16. Defendants concede that they received this note. Dkt. 81 at 6. On July 27, 2010, Ms. Alton obtained and then provided to Defendants a second note from her healthcare provider stating that she was under the provider's "care for treatment

1 for depression" and that it "would greatly benefit her to be able to have a dog as a therapy

2 animal" Dkt. 82-17; Alton Dep. at 205:12–206:12.

3       In January 2011, Ms. Alton obtained her dog, Scrappee Ann, from her neighbor.

4 Alton Dep. at 85:2–7. She informed Defendants that she had obtained the dog, and

5 Defendants told her that she had to sign a pet agreement and pay the $1,000 pet deposit.

6 *Id*. at 166:24–167:13. Ms. Alton testified that she told either Ms. Thompson or Ms.

7 Barber at that time that Scrappee was a "service animal," and she should not have to pay

8 the deposit. *Id*. at 169:9–170:2. Specifically, the question and Ms. Alton's answer are as

9 follows:

10       Q. Did you ever specifically ask the defendants for a waiver of the pet deposit?

11       A. I had spoken with Lori about this being a service animal and that you weren't allowed to charge a deposit on a service animal. She explained

12       to me in the State of Washington-- either her or Linda, I don't know. But it was explained to me in the same area of time that in the State of

13       Washington they did not recognize companion animals as service animals, so thereby it would be considered a pet and I would have to pay the pet

14       deposit.

15 *Id*. In February 2011, Dee Areal, a friend of the Barbers who was acting under

16 instructions from Ms. Barber, brought the pet agreement to Ms. Alton and had her sign it.

17 *Id*. at 165:9–19. That same month, Ms. Alton began paying $50 per month toward the pet

18 deposit. *Id*. at 168:1–169:8.

19       On March 7, 2011, Ms. Alton obtained and then provided to Defendants another

20 note from her healthcare provider, which states that she has major depressive disorder

21 and PTSD, anxiety, and fear of going into public places; the note states that Ms. Alton

22 "benefits greatly from her dog companion, who keeps her company and also helps to

relieve her depression and anxiety" and that the provider believed it was in Ms. Alton's "best interest for her mental health to continue to own and take care of her dog." Dkt. 82-18; Alton Dep. at 211:4–212:17.  That same month, Ms. Alton had her annual review with the Kelso Housing Authority.  Ms. Alton asked her housing counselor, Cecilia Larson, if she could deduct the $50 payments toward the pet deposit as a medical expense to lower her rent payment, and Ms. Larson informed her that she should not be paying a deposit for an assistance animal.  Alton Dep. at 89:2–13.  Ms. Alton then filed a complaint of housing discrimination with the United States Department of Housing and Urban Development ("HUD"), which was mailed to Defendants on April 7, 2011.  Ex. 3.

On May 16, 2011, Ms. Alton obtained and then provided to Defendants a fourth note from her healthcare provider, stating that "Diana Alton has a disability" and that the note "is a request for [Ms. Alton] to have an accommodation to have an equal opportunity to enjoy the dwelling where she resides."  Dkt. 82-19.  The note states that Ms. Alton's "level of functioning and overall stability would be greatly improved by having a service animal."  Dkt. 82-19; Alton Dep. at 215:10–216:3.

On July 25, 2011, Ms. Alton sent a letter to Defendants stating, in part, "I request reasonable accommodations for my disability in the form of a dog."  Dkt. 82-25 at 1.  This letter attaches a fifth note, a prescription from her medical provider, that states that Ms. Alton "has a disability" and it is "medically necessary to have equal opportunity to enjoy the dwelling."  Therefore, I am "prescribing a companion/service animal for this patient based on above factors."  *Id*. at 2.  Defendants concede that they received this note. Dkt. 81 at 6.  In fact, on August 8, 2011, Defendants' attorney sent Ms. Alton a

letter stating "Thank you for submitting your request for a service animal" and requesting that Ms. Alton have her provider fill out the attached Service Animal Certification Form ("SAF") within 30 days. The letter stated that, upon receipt of the completed form, Defendants would make a decision on her request within 10 days. Dkt. 82-26.

In response, Ms. Alton provided a sixth note, dated October 4, 2011, from her medical provider to Defendants' attorney. This note provided that Ms. Alton

> is in need of having her dog as she helps her with [Ms. Alton's] physical and mental disabilities. This dog gives [Ms. Alton] needed emotional assistance as to manage her anxiety and depression so she can maintain her mental functioning in her daily living.

Dkt. 82-22. The note attached Defendants' SAF, which Ms. Alton's medical provider crossed out and added a note to "please see letter [and] prescription given to [patient]." Dkt. 82-21.

Ms. Alton continued to pay the pet deposit until she moved out of the Barbers' property in May 2012. Alton Dep. at 168:1–169:8. Defendants admit that they did not return $350 of the $750 Ms. Alton paid toward the deposit. Dkt. 81 at 22. Ms. Alton testified that after she filed her HUD complaint, "things started getting very uncomfortable" with Defendants. Alton Dep. at 89:14–25. For example, Defendants sent Ms. Alton a letter requiring her to submit all repair requests in writing when prior to her complaint they permitted oral requests. Dkt. 82-28. Thus, when Ms. Alton later called Ms. Barber to report an urgent maintenance issue (a broken lock on her front door), Ms. Barber angrily told Ms. Alton to never call her again. Alton Dep. at 89:14–22. Less than three weeks after being notified of Ms. Alton's HUD complaint, Defendants sent a letter

to Ms. Alton regarding the terms of the pet agreement, including "leash and licensing requirements." Dkt. 82- 24 at 1. These requirements included keeping Scrappee on a leash at all times. Ms. Alton claims that Ms. Barber also made intimidating statements, telling Ms. Alton that she knew all of the local judges and if she were to bring a lawsuit she would lose in court. Alton Dep. at 248:10–249:24. Ms. Alton also claims that she was so concerned about keeping the peace that she asked the police to be present at her move-out inspection. *Id*. at 170:11–17.

### III. DISCUSSION

The Government moves for summary judgment on whether Defendants' policy violates the FHA. Dkt. 79 at 1. Defendants move for summary judgment on the Government's claims on behalf of Ms. Alton. Dkt. 81 at 1.

**A.     Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").

*See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

With regard to the burden of proof, "*where the moving party has the burden*—the plaintiff on a claim for relief or the defendant on an affirmative defense— *his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.*" *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (citation omitted); *see also Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

B.     **Defendants' Policy**

In this case, the Government moves for summary judgment on three distinct issues, which are as follows: (1) Defendants' policy violates the FHA's reasonable accommodation provisions, 42 U.S.C. § 3604(f)(3)(B); (2) Defendants' policy imposes discriminatory terms and conditions, in violation of 42 U.S.C § 3604(f)(2); and (3) Defendants' policy constitutes a pattern or practice of discrimination and/or a denial of rights to a group of persons which raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a). Dkt. 79 at 1. As the moving party with the burden of persuasion on the claim, the Government must show that no reasonable trier of fact would find other than for the Government.

1.     **FHA Reasonable Accommodation**

The FHA defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). An accommodation is "reasonable" if it does not impose "undue financial and administrative burdens" or constitute a "fundamental alteration in the nature of [defendants'] program." *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1157 (2003) (quoting *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 410 (1979)). An accommodation is "necessary" if, "but for the accommodation, [a person with a disability] likely will be denied an equal opportunity to enjoy the housing of [her] choice." *Id*. at 1155 (quoting *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795

(6th Cir. 1996)); *United States v. California Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1381 (9th Cir. 1997).

The Office of Fair Housing and Equal Opportunity has concluded that an "assistance animal is not a pet" and is an animal "that works, provides assistance, or performs tasks for the benefit of a person with a disability, or provides emotional support that alleviates one or more identified symptoms or effects of a person's disability." *Service Animals and Assistance Animals for Persons with Disabilities in Housing and HUD-Funded Programs*, FHEO-2013-01 (Apr. 25, 2013) ("FHEO Notice"). A housing provider covered by the FHA must "evaluate a request for a reasonable accommodation to possess an assistance animal in a dwelling using the general principles applicable to all reasonable accommodation requests." *Id*. at 3.

> A housing provider may not deny a reasonable accommodation request because he or she is uncertain whether or not the person seeking the accommodation has a disability or a disability-related need for an assistance animal. Housing providers may ask individuals who have disabilities that are not readily apparent or known to the provider to submit reliable documentation of a disability and their disability-related need for an assistance animal. If the disability is readily apparent or known but the disability-related need for the assistance animal is not, the housing provider may ask the individual to provide documentation of the disability-related need for an assistance animal. For example, the housing provider may ask persons who are seeking a reasonable accommodation for an assistance animal that provides emotional support to provide documentation from a physician, psychiatrist, social worker, or other mental health professional that the animal provides emotional support that alleviates one or more of the identified symptoms or effects of an existing disability. Such documentation is sufficient if it establishes that an individual has a disability and that the animal in question will provide some type of disability-related assistance or emotional support.

*Id*. at 3–4.

In this case, the Government argues that "undisputed evidence shows that Defendants have a policy that precludes persons with disabilities who need untrained assistance animals from receiving a reasonable accommodation." Dkt. 100 at 1. The evidence shows no such preclusive policy. First, Defendants' SAF does not contain any inappropriate question. A housing provider is allowed to request information to determine whether "an individual has a disability and that the animal in question will provide some type of disability-related assistance or emotional support." FHEO Notice at 3–4. Moreover, it is not a *per se* violation of the FHA to request "what work or service the proposed animal will perform to ameliorate the unique problems of the handicapped person." Contrary to the Government's position, such a request is in no way an outright refusal to allow a reasonable accommodation for either a service animal or an assistance animal. Therefore, the Government has failed to show that Defendants have an explicit policy refusing reasonable accommodations for assistance animals.

With regard to individual applications of the policy, the evidence shows that, at most, Defendants consider applications on a case-by-case basis. For example, Ms. Barber stated that a recent request for a service or a companion animal was turned over to her attorneys. Dkt. 100-1 at 5. Moreover, Ms. Thompson stated that if she had any questions about answers provided on the Defendants' SAF, she would consult the attorney. Dkt. 100-2 at 5. It is not a refusal to provide a reasonable accommodation by implementing a policy of consulting an attorney before authorizing a companion animal. Therefore, the Court denies the Government's motion on this issue because the

Government has failed to show that it is entitled to judgment as a matter of law or that no reasonable juror could find for Defendants.

### 2. Terms and Conditions

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of . . . rental of a dwelling" because of the "handicap" of the renter. 42 U.S.C. § 3604(f)(2).

In this case, the analysis on this issue is essentially the same as the previous issue. The evidence show that, if someone requests an accommodation, the individual is asked to complete the SAF. If questions arise from a completed SAF or the person refuses to complete the SAF, then Defendants consult their attorneys. Such a policy is not discriminatory. Therefore, the Court denies the Government's motion because they have failed to show that it is entitled to judgment as a matter of law or that no reasonable juror could find for Defendants.

### 3. Pattern or Practice

A housing provider violates the FHA by implementing a policy that discriminates against a group of persons and raises an issue of general public importance. 42 U.S.C. § 3614(a). An isolated act, such as the implementation of a discriminatory policy, violates this provision if the policy "affects more than a single individual." *See United States v. City of Parma, Ohio*, 494 F. Supp. 1049, 1095 (N.D. Ohio 1980) (citing *United States v. Hunter*, 459 F.2d 205, 217–18 (4th Cir. 1972)).

In this case, the Government has failed to show a policy of discrimination. Therefore, the Court denies the Government's motion on this issue of whether Defendants have engaged in a pattern or practice of discrimination.[1]

**C.     Claims on Behalf of Ms. Alton**

In this case, Defendants move for summary judgment on the Government's claims on behalf of Ms. Alton because (1) the Government has failed to allege any computation of damages, (2) the claims fail as a matter of law under Washington law, (3) Ms. Alton did not legally own Scrappee Anne, (4) Ms. Alton never requested a reasonable accommodation, (5) the Government is unable to meet its burden on all elements of the discrimination claim, and (6) the retaliation claim is meritless. Dkt. 81. The main problem with Defendants' motion is that they fail to view the facts in the light most favorable to the Government. While they may have strong evidence in support of their position, the Court is charged with determining whether evidence exists and is precluded from weighing the evidence when considering this motion.

With regard to the issue of no allegation or computation of damages, Defendants' motion is without merit. Defendants' position is that the Government has failed to comply with its discovery obligations by supplementing its initial disclosures. Dkt. 81 at 8–9. Even if the Government did violate discovery rules, dismissal of this claim is a

---

[1] Defendants' motion on these issues was stricken for failure to abide by local rules. The Court is inclined to grant Defendants judgment as a matter of law on these claims either at a pretrial hearing upon oral motion or on a Rule 50(a) motion.

ORDER - 12

1 drastic remedy that the Court declines to impose. Therefore, the Court denies

2 Defendants' motion on this issue.

3 With regard to whether the claim fails as a matter of law under Washington state

4 law, the issue is without merit because this action is brought under the FHA. Federal law

5 establishes the baseline for individual protection against discrimination regardless of any

6 additional restrictions or elements an individual must prove under state law. Therefore,

7 the Court denies the motion on this issue.

8 With regard to the fact that Scrappee Anne was not licensed pursuant to the local

9 ordinances, Defendants' arguments are also without merit. This issue is a post-hoc

10 discovery raised only for the purposes of litigation and has no bearing on whether

11 Defendants discriminated against Ms. Alton during the period of her tenancy. While

12 violations of the lease would justify disciplinary action pursuant to the terms of the lease

13 or maybe even termination of a lease, there is no evidence in the record that shows that

14 Defendants based any action on any violation of the licensing laws. Therefore, the Court

15 denies Defendants' motion on this issue. The remaining issues are the elements of the

16 claim for discrimination and the retaliation claim.

17 **4. Discrimination**

18 The FHA defines discrimination to include "a refusal to make reasonable

19 accommodations in rules, policies, practices, or services, when such accommodations

20 may be necessary to afford [a disabled] person equal opportunity to use and enjoy a

21 dwelling." 42 U.S.C. § 3604(f)(3)(B).

22

> To make out a claim of discrimination based on failure to reasonably accommodate, a plaintiff must demonstrate that (1) he suffers from a handicap as defined by the FHAA; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap 'may be necessary' to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation.

*Giebeler v. M & B Assoc.*, 343 F.3d 1143, 1147 (9th Cir. 2003). The reasonable accommodation analysis is a fact-specific inquiry. *See United States v. Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994).

In this case, Defendants contest the last three elements of the Government's claim. First, Defendants claim that they did not know of Ms. Alton's disability. In making this argument, Defendants fail to consider the facts in the light most favorable to Ms. Alton. When viewed properly, the evidence shows that Ms. Alton informed the Defendants and provided sufficient notice of her disability. Ms. Alton alleges that she sent Defendants multiple notes stating her illnesses and also personally informed Defendants of her PTSD and depression. Therefore, the Court denies Defendants' motion on this issue.

Second, Defendants contend that the Government has failed to establish that Scrappee Anne was necessary for Ms. Alton to enjoy use of the apartment. Specifically, Defendants argue that the Government "has failed to establish that the dog alleviated the effects of Ms. Alton's disability." Contrary to this position, the Government need not "establish" any fact at this juncture. The Government is required to submit evidence that creates a material question of fact for the factfinder. Under that standard, there is sufficient evidence in the record from medical providers stating that Scrappee Anne

provides a disability related benefit. Therefore, the Court denies Defendants' motion on this issue.

Third, Defendants contend that the requested accommodation was not reasonable. There are two parts to this issue with the first part being whether Ms. Alton ever requested a waiver of the pet deposit. Defendants argue that she never made such a request. Dkt. 81 at 13–15. Ms. Alton's deposition and her HUD complaint dispute this contention and create a material question of fact whether Ms. Alton made such a request. Therefore, Defendants' motion is without merit on the issue of whether Ms. Alton requested a waiver of the pet deposit.

With regard to whether the request was reasonable, a plaintiff requesting an accommodation under the FHA must show that the accommodation is reasonable. *Giebeler*, 343 F.3d at 1147. The Government contends that "[w]aiver of a pet deposit is *per se* reasonable for assistance animals that serve as reasonable accommodations for tenants with disabilities . . . ." Dkt. 98 at 19 n. 12. The Government, however, fails to provide binding authority for this proposition. Instead, the Government provides citations to numerous cases that have settled with consent decrees that include provisions requiring the housing provider to waive such fees. Dkt. 79 at 13–14. Settlements do not establish *per se* rules of law. Therefore, the Government's position is wholly without merit.

On the other hand, Defendants contend that Ms. Alton only requested that she be allowed to have a dog at the residence. Dkt. 101 at 10–11. Again, Defendants ignore Ms. Alton's deposition testimony and her HUD complaint wherein she requested waiver

1  of the pet deposit.  Moreover, there is a question of fact whether Ms. Alton was able to

2  reasonably enjoy the apartment with the additional financial burdens of paying the pet

3  deposit.  Ms. Alton was on a limited income and there is evidence in the record that

4  paying the deposit caused her financial strain.  Therefore, the Court denies Defendants'

5  motion on this issue and the Government's discrimination claim.

6      **5.**    **Retaliation**

7      Under the FHA, it is "unlawful to coerce, intimidate, threaten, or interfere with

8  any person in the exercise or enjoyment of, or on account of his having exercised and

9  enjoyed . . . any right granted or protected by [the Act]."  42 U.S.C. § 3617.  Section

10  3617 "has been broadly applied to reach all practices which have the effect of interfering

11  with the exercise of rights under the federal fair housing laws." *Walker v. City of*

12  *Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001).  Although the Ninth Circuit has not

13  adopted a specific standard for retaliation claims under the FHA, both parties cite the

14  burden shifting framework of Title VII actions.  Dkts. 81 at 23 & 98 at 23.  Under that

15  standard, a plaintiff establishes a prima facie claim of retaliation by showing that (1) the

16  tenant engaged in protected activity; (2) she suffered an adverse action, such as coercion,

17  intimidation, threats, or interference; and (3) a causal link existed between the protected

18  activity and the adverse action. *See Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th

19  Cir. 2003).

20      In this case, Defendants argue that the Government's claim of retaliation is

21  meritless.  It is undisputed that Ms. Alton engaged in a protected activity by filing a HUD

22  complaint.  While the Court agrees with Defendants that enforcement of the leash law

1  and forcing Ms. Alton to submit all repair requesting in writing are not adverse actions,
2  Ms. Alton declares that Ms. Barber stated she knew all the local judges and that Ms.
3  Alton would lose in court if she brought a lawsuit. Alton Dep. at 248:10–249:24. This is
4  sufficient evidence of an intimidation or threat with a causal link between the protected
5  activity and the adverse action. Therefore, the Court denies Defendants' motion on this
6  issue.

## IV. ORDER

Therefore, it is hereby **ORDERED** that the Government's motion for summary judgment (Dkt. 79) and Defendants' motion for summary judgment (Dkt. 81) are **DENIED**.

Dated this 7th day of October, 2014.

_(signature)_
BENJAMIN H. SETTLE
United States District Judge